UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at GREENEVILLE

| | | |
|---|---|---|
| JAMES ALAN BATES, TDOC # 127437 | ) | |
| | ) | |
| v. | ) | NO. 2:09-CV-120 |
| | ) | *Greer/Inman* |
| HOWARD CARLTON, Warden | ) | |

**MEMORANDUM OPINION**

James Alan Bates, a state prisoner proceeding *pro se*, brings this petition for a writ of habeas corpus under 28 U.S.C. § 2254, challenging the legality of his confinement pursuant to his 2003 criminal convictions in the Sullivan County, Tennessee Circuit Court. His effective sentence for those crimes was forty-six years, [Doc. 4]. Respondent Warden has filed a response, which is supported by copies of the state court record, [Docs. 8, 9]. Thus, this case is ripe for disposition.

I. **Procedural History**

In late January of 2003, petitioner was convicted of two counts of especially aggravated kidnapping; three counts of misdemeanor assault; and one count each of possession of a weapon by a convicted felon, felony evading arrest, and possession of marijuana. On direct appeal, Bates only challenged the especially aggravated kidnapping convictions (as he does here) and these convictions were affirmed by the Tennessee Court of Criminal Appeals. *State v. Bates*, No. E2003-01475-CCA-R3-CD, 2004 WL 995046 (Tenn. Crim. App. May 7, 2004), *perm. app. den.*, (Tenn. 2004). His subsequent petition for post-conviction relief was denied. *State v. Bates*, E2007-00187-CCA-MR3-PC, 2008 WL 465271 (Tenn. Crim. App. Feb. 21, 2008), *perm. app. den.*, (Tenn. 2008).[1]

He now brings this instant habeas corpus petition, seeking release from his alleged unlawful confinement.

---

[1] Typically, the petitioner is the leading party in the caption of a Tennessee court's post-conviction opinion, but in Bates' case, that position is occupied by the State. There is one further minor discrepancy to be noted. Bates spells his middle name "Alan" in his federal petition—the same spelling used in the post-conviction opinion, but in the state appellate court's opinion on his direct review, his middle name is spelled "Allen."

## II. Factual Background

The factual recitation is taken from the Supreme Court's opinion on direct review of Bates' convictions. *State v. Bates*, 2004 WL 995046.

> Amanda Herron, the victim in this case, testified that she was spending the night of August 27, 2001, with the Defendant in his trailer. While she had used illegal drugs in the past, she stated that she had not used any such substances on the day or night in question. When she went to bed at about eleven p.m., the Defendant was on the couch. When she got up some time later to go to the bathroom and get a drink of water, the Defendant was still on the couch, asleep. He had a beer in one hand and a pill bottle in the other. Ms. Herron went back to bed without disturbing the Defendant.
>
> The next thing she knew, Ms. Herron awoke to the Defendant pulling her hair and yelling at her. She testified that the Defendant yelled, "Bitch, what did you do with my shit?" Ms. Herron assumed that the Defendant was referring to his drug of choice, Oxycontin, or money. Ms. Herron told the Defendant that she did not know what he was talking about, but he pulled her out of bed by her hair and into the hallway, all the while repeating his question. Ms. Herron testified that the Defendant was "very loud and angry" and that she had never seen him like that before. The Defendant took the victim into the living room, where she searched the couch for pills. She found none, and the Defendant dragged her into the bathroom, still holding her hair. The Defendant told the victim, who was wearing shorts, a tee-shirt, bra and panties, to strip so that he could search her. The victim removed her shirt, and the Defendant then removed her shorts and panties; he also searched under her bra. Finding no drugs in her clothes, the Defendant inserted his fingers into the victim's vagina and rectum. Still not finding what he was looking for, the Defendant produced a pistol and hit the victim's face with it.
>
> The Defendant then made the victim lie down, and he tied her hands and feet. Ms. Herron testified that she was "very scared" and begged the Defendant to stop. After tying her up, the Defendant again struck the victim in the face with the gun. He then put the gun in her mouth and threatened to blow her brains out. He followed this action with placing the barrel of the gun in the victim's vagina, threatening to blow her guts out.
>
> In order to escape the Defendant, Ms. Herron told him that she had put his stuff in her truck. When he left the trailer to go check, Ms. Herron managed to free her feet and jumped out of a window, knocking the screen out. She ran to the trailer next door and beat on the door with her elbow, screaming for help and for someone to call the police. While she was doing this, the Defendant came up behind her, grabbed her by her hair and dragged her back to his trailer. He struck her with the gun again and tied her hands and feet again. He then burned her with a cigarette and pinched her body in various

2

places with a pair of pliers. Eventually, the Defendant became tired and lay down beside her, tying her to him and placing the gun on his chest. After he fell asleep, the victim was able to free herself sufficiently to escape. She ran to a nearby store, and the police were contacted. She was taken to the hospital and later photographed by Detective Penney Kendal.

Edna Smith testified that she lived in a trailer next to the Defendant's. She had met both the Defendant and the victim, but did not know either of them well. She testified that at about three a.m. on the night in question, she "heard a terrible racket come against the trailer." She got up and looked outside but did not see anyone. She testified that she did not hear any knocking or screaming. She did not go outside until about nine o'clock that morning, at which time she saw the Defendant with a window screen in his hand.

Det. Penney Kendal testified that she saw the victim at about eight o'clock in the morning on August 28, 2001. She described the victim as "very distraught, tired, scared." She described the victim's physical condition as follows:

Her eyes were swollen, her eyelids were black and blue and purple, her lips ... were great big swollen, protruding red, dried blood on them. She had a very large and long deep tissue bruise across the right [arm], by the triceps and biceps, black, blue, very deep, long approximately two inches thick. She had ligature marks around both wrists. There was still a piece of some type of twine around one wrist. Her hands were swollen, red scratched, bloody. She had a burn mark on her arm. Just various nicks and bruises and fresh marks all up and down her arms. Her knees and legs were scraped up. One leg had a very long scrape, bloody abrasion. There [were] ligature marks around her ankles. Her feet and legs appeared swollen especially around the ligature marks.... [S]he had a few little pieces of hair missing. There were scratches on her buttocks, in the buttocks area, and there were some little pieces of skin, nicks and scratches on her back.

Det. Kendal testified that, when she visited the Defendant's trailer, she saw a bent screen half-way back in its window.

Detective David Cole also saw the victim that morning. He described the binding around her wrist as very tight, requiring that it be cut off. He executed a search warrant of the Defendant's trailer later that afternoon. There, he found in a garbage bag "various items of clothing and ropes and twine that [were] tied together." The couch cushions were scattered. He found a bra, pair of pants and shirt in a trash can in the kitchen. The bra had a thick shoestring knotted on it. Det. Cole found what appeared to be bloodstains on the bathroom floor, the bedroom doorknob and on a section of carpet. He took samples from each of these locations. When the Defendant was apprehended, he was carrying a pillowcase containing a loaded .22 revolver and several pills. Det. Cole later oversaw blood samples being drawn from both the Defendant and the victim.

3

Agent Kelvin Woodby of the TBI crime lab testified as an expert in DNA serology. He examined the samples taken from the bedroom doorknob and carpet and determined the presence of the victim's blood. He identified a mixture of DNA from the bathroom floor, of which the victim was a major contributor and the Defendant a possible contributor.

Agent Denise Buckner of the TBI identified the tablets found in the pillowcase as oxycodone and Zanax.

The Defendant recalled Det. Kendal, who testified that the victim had pending charges for attempt to commit aggravated robbery and robbery. She stated that the victim had confessed the robbery, a purse snatching, to her, and that she believed that the victim had been truthful to her about committing the crime.

Tanya Tunnell testified that she had known the Defendant and the victim for several years. She stated that she went by the Defendant's trailer at about two o'clock on the morning of August 28, 2001, and found the Defendant and victim both there. There was nothing wrong with the victim. Ms. Tussell stayed about thirty to forty-five minutes. She remembered the day because of the Defendant's arrest later that afternoon. Ms. Tussell stated that the Defendant "didn't do Oxycontins."

Rachel Cross testified that she had been friends with the victim, and did not know the Defendant. She stated that the victim told her in June 2002 that, with respect to her sexual preferences, the victim "liked to be tied up and held down." Ms. Cross also testified that the victim had told her that she had not actually been penetrated with the gun.

John McBee testified that he had had a sexual relationship with the victim in late 2001. He stated that, after they had been together about three weeks, they had been "getting ready to have sex," and the victim asked him if he would like to tie her up. He told her no, and she did not ask him about it again.

*State v. Bates*, 2004 WL 995046, at *1-*3.

### III. Discussion

Petitioner's habeas corpus application contains four grounds for relief. Those grounds are that: 1) the evidence was insufficient to convict petitioner of the two counts of aggravated kidnapping, 2) he was sentenced as a Range II Violent Offender, 3) in several instances, he had ineffective assistance of counsel, and 4) one specific attorney error was counsel's failure to move for a speedy trial. The Warden submits, in his response, that one claim is not a cognizable habeas corpus claim (Ground 2),

and that petitioner is not entitled to relief from the state court decisions rejecting the remaining claims on their merits (Grounds 1, 3-4), given the deferential standards of review required for adjudicated claims in 28 U.S.C. § 2254. The Court agrees with the Warden and, for the following reasons, will **DENY** the petition and **DISMISS** this case.

The alleged non-cognizable claim will be addressed first.

### A. Non-Cognizable Claim (Pet., Ground 2)

In this ground for relief, petitioner complains that he was incorrectly sentenced under state law. More specifically, he claims that two prior rape convictions were treated as separate crimes for purposes of determining his prior convictions and, ultimately, of establishing his sentencing range, when those rape convictions should have been counted as a single offense under Tennessee's "24 hour merger rule," as set forth in Tenn. Code. Ann. § 40-35-106(b)(4). Respondent aptly argues that petitioner cannot be granted relief on this ground because it is not a recognizable federal habeas corpus claim.

The law is clear. The interpretation of state statutes lies within the exclusive purview of state courts, since those courts are the final arbiters of state law. *See Lewis v. Jeffers*, 497 U.S. 764, 780 (1990). Where state courts have spoken on a matter of state law, it is not the role of a federal habeas court "to reexamine state-court determinations of state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). A decision which rests entirely on state law generally is not of federal concern. *See e.g., Swarthout v. Cooke*, _ U.S. _, _, 131 S. Ct. 859, 861, 178 L. Ed.2d 732 (2011) (claims which allege a state law error or an incorrect application of state law do not present cognizable issues for federal habeas review).

Because this claim does not allege a violation of federal constitutional law, it provides no recognizable basis for habeas corpus relief.

### B. Adjudicated Claims

Under the review standards set forth in 28 U.S.C. § 2254(d), a court considering a habeas claim must defer to any decision by a state court concerning that claim unless the state court's judgment (1)

5

"resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C.A. § 2254(d)(1)-(2).

A state court's decision is "contrary to" federal law when it arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or resolves a case differently on a set of facts which cannot be distinguished materially from those upon which the precedent was decided. *Williams v. Taylor*, 529 U.S. 362, 413 (2000). Under the "unreasonable application" prong of § 2254(d)(1), the relevant inquiry is whether the state court decision identifies the legal rule in Supreme Court cases which governs the issue but unreasonably applies that principle to the particular facts of the case. *Id.*, at 407. The habeas court is to determine only whether the state court's decision is objectively reasonable, not whether, in the habeas court's view, it is incorrect or wrong. *Id.*, at 411.

Findings of fact which are sustained by the record are entitled to a presumption of correctness, unless a petitioner rebuts that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

1. *Insufficient Evidence (Pet., Ground 1)*

Petitioner challenges the sufficiency of the convicting evidence on the especially aggravated kidnapping charges, arguing that the proof, though adequate to show that he had a gun, was inadequate to show that he used the firearm to force the victim into submission. Indeed, so petitioner argues, the victim admitted that he did not brandish the weapon and she did not even see it until she was tied up the first time. Thus, he suggests, the confinement was accomplished with constraints and not a deadly weapon, which was incidental to the confinement. Furthermore, petitioner also argues that the victim's testimony was not credible, was not borne out by the testimony of others, and was negated by her prior criminal convictions.

    a. The Controlling Law

The standard which controls this type of claim is found in *Jackson v. Virginia*, 443 U.S. 307, 324 (1979). There, the Supreme Court held that sufficient evidence supports a conviction if, after

viewing the evidence and the inferences to be drawn therefrom in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.*, at 324. It is the responsibility of the trier of fact to resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from the facts. *Herrera v. Collins*, 506 U.S. 390, 401-02 (1993). Petitioner "bears a heavy burden" when insufficiency of the evidence is claimed. *United States v. Vannerson*, 786 F.2d 221, 225 (6th Cir.1986).

b. <u>Analysis</u>

Petitioner's insufficient-evidence claim was offered on direct review, supported by the same arguments now made in his § 2254 petition. The Tennessee Court of Criminal Appeals examined the evidence against petitioner and did so in the context of the elements of the offense. This Court will follow suit.

Especially aggravated kidnapping is defined as false imprisonment [i.e., "the knowing removal or confinement of another unlawfully so as to interfere substantially with the other's liberty"] which: (1) is committed with a deadly weapon. Tenn.Code Ann. § 39-13-305(a)(1) and § 39-13-302(a).

In assessing this claim, the state court initially pointed to the evidence adduced at trial. That proof showed that, before petitioner tied up the victim initially, which he acknowledged having done, he beat her with the weapon, brandished it in her face, and terrorized her with it. The state court reasoned that because of the weapon, petitioner was able to tie the victim up without meeting any physical resistance on her part. Likewise, when petitioner recaptured the victim following her first escape, he beat her with the gun before tying her up the second time. Rejecting petitioner's argument that the deadly-weapon element of the crime is satisfied only where a victim is threatened to be shot if she tries to leave, the Court of Criminal Appeals found the evidence to be "more than sufficient to support [petitioner's] convictions of two counts of especially aggravated kidnapping accomplished with a deadly weapon beyond a reasonable doubt." *State v. Bates*, 2004 WL 995046, at *4.

The Court of Criminal Appeals conducted its review under Rule 13(e) of the Tennessee Rules of Appellate Procedure, which embodies the standard for evidentiary sufficiency established in *Jackson*

7

*v. Virginia*, 443 U.S. 307 (1979), and it also cited to *Jackson* in its discussion. The test for a claim of insufficient evidence is, as the state court recognized, that enunciated in *Jackson*. *See Gall v. Parker,* 231 F.3rd 265, 287-88 (6th Cir. 2000). Because the state court, in analyzing the insufficient-evidence claim, applied the principles in *Jackson*—the relevant Supreme Court precedent, this Court can only grant relief if petitioner demonstrates that the application itself was unreasonable or that the decision was based on an unreasonable factual determination.

Although not altogether clear, petitioner seemingly is challenging one of the state court's factual findings by arguing that the victim admitted that petitioner did not brandish a weapon. In it's opinion, the state court addressed petitioner's claim that "[t]he confinement was accomplished with constraints, not the deadly weapon," and that "[t]he use of the gun was incidental to the confinement," by finding that he "beat the victim with the gun and brandished it in her face, terrorizing her with it," before concluding that because of the weapon petitioner was able to tie the victim up without meeting any physical resistance on her part. *Bates*, 2004 WL 995046, *at 4. This Court has reviewed the transcript of the victim's trial testimony and finds that it fully supports the state court's questioned factual finding, [Doc. 9, Addendum 2, Tr. T. at 220 (the victim states that petitioner "did strike me in the face a couple of times . . .[with] a pistol . . . and that "he put it in my face"); at 234 (averring that petitioner re-seized her and dragged her back to his trailer, where she saw the revolver "in his hand"); and at 246 (testifying that, after he tied her up the second time, he lay down beside her, tied her to him, and had the gun "on his chest").

As to the issue of the victim's credibility, the state court pointed out that credibility assessments lay within the province of the jury, not a court. Insofar as the Court can discern, this issue primarily involves two competing versions of the circumstances surrounding the charged offenses and the jury's obvious acceptance of the version offered by the victim, as bolstered by other proof in the record. A jury is free to choose which version of a contested issue is true. *See Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 574 (1985) ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."); *see also Parker v. Matthews*, 567 U.S.

8

\_, \_, 132 S. Ct. 2148, 2152 (2012) ("We have said that 'it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial.'") (quoting *Cavazos v. Smith*, 565 U.S. 1, \_, 132 S. Ct. 2, 4 (2011) (per curiam).

In view of all the proof in the record, the state court's resolution of this claim was not an unreasonable application of the *Jackson* standard nor based on an unreasonable determination of the facts. Since petitioner's claim of insufficiency of the evidence does not pass either of § 2254(d)'s tests, he cannot be granted relief on this claim.

2. *Ineffective Assistance of Counsel (Pet., Grounds 3-4)*

In this ground, petitioner claims, as he did in the state courts, that he had ineffective assistance due to his trial attorney's failure: a) to secure the services of a DNA expert, b) to use an investigator to locate witnesses and perform other tasks, c) to consult sufficiently with him at the jail, d) to press for a speedy trial, and e) to arrange for defense witnesses who were incarcerated to wear street attire when they testified. Petitioner also charges for the very first time that his post-conviction counsel was ineffective as well.

Once again, respondent argues that, under § 2244(d)'s test, the adjudication of the trial-counsel claim must remain undisturbed since the state court decision was reached through a reasonable application of the pertinent Supreme Court precedent and a reasonable determination of the facts presented in the state court proceedings.

a. The Controlling Law

The Supreme Court has established a two-part test for determining when assistance of counsel is ineffective. *See Lockhart v. Fretwell*, 506 U.S. 364, 376-79 (1993); *Strickland v. Washington*, 466 U.S. 668, 686-87 (1984). First, a petitioner must show that his counsel's errors were so egregious as to render counsel's performance constitutionally deficient, that is, outside the "wide range of professional assistance. *Strickland*, 466 U.S. at 687; *Gravely v. Mills*, 87 F.3d 779, 785 (6th Cir. 1996). The alleged errors or omissions must be evaluated from counsel's perspective at the time the conduct occurred and under the circumstances of the particular case. *Strickland*, 466 U.S. at 689. In

9

order to show that counsel's performance was deficient, a petitioner must demonstrate "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.*, at 687.

Second, a petitioner must demonstrate prejudice by showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Id.*, at 690, 694. Finally, as the Sixth Circuit teaches, the Court's review of the claim does not end with a finding that petitioner has satisfied *Strickland* but must then consider whether it was objectively unreasonable for the state court to reach the opposite conclusion. *Tibbetts v. Bradshaw*, 633 F.3d 436, 442 (6th Cir. 2011) (noting that habeas corpus review must utilize both the *Strickland* and § 2244(d) standards, the latter of which "sets forth a heavy burden for a petitioner to overcome").

    b. <u>Analysis</u>

The Court addresses each sub-claim individually in the order in which it was raised in the federal petition.

        1) *DNA Expert*

In this sub-claim, petitioner makes the contentions which follow. His trial attorney, though aware that the DNA results would be exculpatory or, at least, not inculpatory, failed to secure a defense DNA expert witness. Had counsel so done, the defense expert could have impeached the state's DNA expert and could also have bolstered petitioner's defense by demonstrating the absence of DNA in certain locations, where (by inference), it would have been found had the facts, as presented by the victim, been true.

When this claim was raised in the state appellate court, it first observed that petitioner did not offer a DNA expert witness at the post-conviction hearing and that, without such a witness, generally, a court must speculate as to whether the witness existed and could have been discovered or whether prejudice ensued. The state court further noted that, absent the presentation of the expert witness at the evidentiary hearing to support such allegations, a petitioner cannot establish that he had ineffective

assistance. It then continued its analysis by recounting trial counsel's testimony at the evidentiary hearing.

During the hearing, the trial attorney stated that he determined, upon reviewing the lab results he was provided during discovery, that the prosecution's DNA evidence, as it related to the victim's allegations involving the kidnapping and rape charges, was inconclusive and that, in his judgment, an independent DNA expert was unnecessary. Counsel further averred that he used the State's own DNA expert to make the points he wished to make, i.e., that the DNA test findings were inconclusive, that the weapon, with which the victim claimed to have been penetrated, contained no type of DNA, and that no time frame could be provided as to when any DNA found at the scene had been deposited. Finally, counsel stated that, in his opinion, petitioner's acquittal on the rape charges which corresponded with the allegations of ineffective assistance negated any such an allegation.

Based upon the above testimony, which was accredited by the post-conviction court and found to be supported in the record, the Tennessee Court of Criminal Appeals concluded that petitioner's claim lacked merit.

As noted earlier in this opinion, a state court's factual findings which have support in the record are presumed correct unless rebutted by evidence that is clear and convincing. Credibility findings by the state court are entitled to special deference. See e.g., *Patton v. Yount*, 467 U.S. 1025, 1038 (1984); *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983) ("28 U.S.C. § 2254 gives federal habeas courts no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them.") (pre-AEDPA case). Thus, this Court defers to the state court's credibility determinations of a witness whose demeanor has been observed by that court, unless petitioner demonstrates the state credibility determinations are not supported by the record. *See Rice v. Collins*, 546 U.S. 333, 342 (2006) ("Reasonable minds reviewing the record might disagree about the prosecutor's credibility, but on habeas review that does not suffice to supersede the trial's court's credibility determination."); *Teti v. Bender*, 507 F.3d 50, 59 (1st Cir. 2007) ("[T]he state trial judge's implicit credibility determinations, adopted by [an appellate court], are exactly the type of factual

11

determinations to which we defer, at least short of any indication of serious error.") (citing *Rice*, 546 U.S. at 341-42).

The state court's credibility determinations are supported by the record and no clear and convincing evidence has been adduced to refute those determinations. Moreover, though the state court did not describe counsel's decision to use the State's DNA expert, rather than to hire a defense expert, as a matter of strategy, counsel's decision fairly can be described as such. A trial strategy " need not be particularly intelligent or even one most lawyers would adopt, but it must be within the range of logical choices an ordinarily competent attorney . . . would assess as reasonable to achieve a 'specific goal.'" *Cone v. Bell*, 243 F.3d 961, 978 (6th Cir. 2001). On the facts here, this one fits the bill. *See Ramonez v. Berghuis*, 490 F.3d 482, 489 (6th Cir. 2007) ("Constitutionally effective counsel must develop trial strategy in the true sense . . . based on what investigation reveals witnesses will actually testify to.")

Given the factual findings that the DNA evidence was inconclusive and was acknowledged to be so by the prosecution's expert witness and the other DNA evidence (or absence of such evidence) brought out during the cross-examination of this witness, along with the rules that counsel is afforded wide latitude in making tactical decisions and is presumed to have exercised reasonable professional judgment in making those decisions, *Strickland*, 466 U.S. at 689-90, the state court's rejection of this ineffective-assistance claim did not result from either an unreasonable factual determination in light of the evidence before it or an unreasonable application of *Strickland*. The writ will not issue with respect to this claim.

2) *Use an Investigator*

In his second sub-claim in this category, petitioner asserts that his trial counsel gave him ineffective assistance for failing to use an investigator who was available through the Public Defender's office to locate material witnesses, to wit, Terry Frost, Scott Kennedy, Red Dykes, Mia Dykes, and Bobby Murray. Had these witnesses been available for trial, they could have testified to the victim's prior sexual history, establishing that the sex acts were consensual, that she liked to be tied

12

up, that the ligature marks were products of her consent, and that she was "scamming" petitioner and the State of Tennessee, so as to qualify for compensation from a victim restitution fund.

This claim was also entertained in the state appellate court, which again iterated defense counsel's post-conviction testimony that he, while unable to contact certain witnesses petitioner had suggested, had found other witnesses who would give similar testimony, and that, pursuant to his pretrial motion, a hearing was held, which resulted in the admission of testimony by witnesses Rachel Cross and John McBee regarding the victim's prior sexual activity and practices. The Court of Criminal Appeals, citing to the post-conviction court's findings, noted that photographs depicting the victim's injuries "were so compelling that, even though the jury might have found she initially consented to being tied up, she did not consent to the extent of the restraint and the physical injuries she suffered," and that presenting five witnesses to testify to the victim's predilection for rough sex and bondage, instead of just the two which were called, would not have led to a different verdict, considering not only the photos, but also "the neighbor's testimony corroborating the victim's account of events." *Bates*, 2008 WL 465271, at *6.

The state appellate court reasoned that petitioner's failure to call these witnesses at the post-conviction hearing was "particularly significant" because, in their absence, the state appellate court was required to engage in guesswork as to the testimony they would have given. Finding that neither a deficient performance nor prejudice had been shown, the Court of Criminal Appeals ultimately concluded that the claim was groundless.

Since these state-court factfindings have record support and since there is no clear and convincing contravening evidence, this Court defers to those findings (i.e., the determinations of the trial court, as adopted by the state appellate court, including that petitioner failed to present witnesses to sustain his post-conviction claim of ineffective assistance), [Doc. 9, Addendum 5, Post-Conviction Hr'g T.].

The post-conviction court found that no different result would have obtained had the five additional witnesses been called and had they testified to the victim's sexual propensities to engage in

13

rough sex and bondage. This was so, according to the state court, because witnesses Cross and McBee had given the same testimony as the uncalled witnesses were expected to give.

By adopting the post-conviction court's findings, the state appellate court found (by implication) that the testimony of these proposed witnesses would have been cumulative. The presumption of correctness applies not only to express findings of fact, but also to unarticulated findings that are necessary to the state court's conclusions of mixed questions of fact and law, such as the finding of cumulative testimony. *See e.g., Marshall*, 459 U.S. at 433; *McQueen v. Scroggy*, 99 F.3d 1302, 1310 (6th Cir. 1996) ("The presumption also applies to "implicit findings of fact . . ."), *cert. den.*, 520 U.S. 1257 (1997), *overruled on other grounds by In re Abdur'Rahman*, 392 F.3d 174 (6th Cir. 2004), *judgment vacated by Bell v. Abdur'Rahman*, 545 U.S. 1151 (2005).[2]

No prejudice accrues to a petitioner when an attorney fails to offer cumulative evidence. *See Beuke v. Houk*, 537 F.3d 618, 645 (6th Cir. 2008) ("A petitioner does not establish prejudice if he shows only that his counsel failed to present 'cumulative' mitigation evidence, that is, evidence already presented to the jury."); *Allen v. Howes*, 438 Fed. Appx. 432, 435, 2011 WL 3701908, *3 (6th Cir. Aug. 25, 2011 (counsel's failure to present cumulative testimony does not result in prejudice).

Given petitioner's failure to provide witnesses to show that counsel's failure to locate and call them at trial constituted a deficiency of performance and to offer testimony at the post-conviction hearing to demonstrate that prejudice flowed from the absence of such trial testimony, the state court did not unreasonably apply *Strickland* when it rejected this claim based on its conclusion that he had not shown either prong of the ineffective-assistance test. No writ will issue on the claim.

### 3) *Insufficient Consultations*

In this claim, petitioner asserts that, during the twenty-month period he was in jail, counsel had one thirty-minute meeting with him in his cell, spoke with him on the telephone less than ten times for five minutes each, and met with him in the holding cell for approximately five minutes before each

---

[2] However, "a state court's ultimate conclusions regarding competence and prejudice are not findings of fact binding on the federal court." *Kimmelman v. Morrison*, 477 U.S. 365, 388 (1986).

14

court hearing. Petitioner insists that in a case involving multiple Class A felony charges, such as he faced, it would have been impossible for a lawyer to conduct a proper investigation and develop the necessary defense theories in such a limited amount of time spent with a criminal accused.

This claim was offered to the Court of Criminal Appeals, which found that petitioner did not "allege specific omissions of trial counsel that would constitute a lack of preparation or investigation in this case" and it thereafter found that, without evidence of any deficiency of performance or prejudice to the defense, the issue had no merit.

The record shows that counsel prepared for trial by meeting with petitioner once for thirty minutes, by talking with him ten times on the telephone, and conferred with him in the holding cell before hearings. To show a deficient performance, *Strickland* requires a petitioner to "identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Strickland*, 466 U.S. at 690. As the state court held, petitioner failed to do this. Furthermore, as the state court likewise held, petitioner has failed to specify any prejudice he sustained due to counsel's failure to meet more frequently with him. Petitioner has not shown either a deficient performance or prejudice and the state court did not unreasonably apply *Strickland* by so concluding. No writ shall issue on this claim.

    4) *Speedy Trial*

The next claimed inadequacy on the part of counsel was his failure to pursue a speedy trial. Petitioner maintains that counsel's omission falls below an objective standard of reasonableness under prevailing professional norms and, thus, constitutes a deficient performance. Had his lawyer engaged in this pursuit, so petitioner posits, defense witnesses may have been available for trial and the prosecution may not have been able to present its DNA expert testimony, "as the evidence was taking a long time to come back."

In addressing petitioner's allegations concerning the cited error, the Court of Criminal Appeals applied the factors set forth in *Barker v. Wingo*, 407 U.S. 514, 521 (1972), to determine whether his entitlement to a speedy trial had been impinged. After examining those factors, the state court found

15

that the delay, while lengthy, was necessary and had been acceded to by the defense; that petitioner told counsel he wanted a speedy trial, which, for various reasons, counsel was disinclined to seek; and that petitioner had not shown prejudice. The state appellate court, finding no violation of petitioner's speedy trial right and, ultimately, no ineffective assistance of counsel, denied petitioner relief.

As the state court recognized, *Barker v. Wingo* governs an alleged violation of the Speedy Trial Clause of the Sixth Amendment to the U.S. Constitution. *Wood v. Vasbinder*, 310 Fed. Appx. 861, 865, 2009 WL 383681, *4 (6th Cir. Feb. 18, 2009) (describing *Barker* as "the seminal case" on the speedy trial right). The right so secured is that, "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy trial," U.S. Const. amend. VI, and is "triggered by arrest, indictment or other official accusation." *United States v. Doggett*, 505 U.S. 647, 655 (1992). States are obliged to honor this right through the Fourteenth Amendment. *Klopfer v. North Carolina*, 386 U.S. 213, 222 (1967). Under *Barker*, a court must perform a balancing test, on a case-by-case basis, by considering: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of his right; and (4) prejudice to the defendant. *Barker*, 407 U.S. at 522, 530-32. An extensive delay is presumptively prejudicial but a petitioner's acquiescence is an extenuating circumstance to be taken into account. *Doggett*, 505 U.S. at 658. The prescribed redress for a violation of the right to a speedy trial is a dismissal of the charges with prejudice. *Barker*, 407 U.S. 522 (characterizing a prejudicial dismissal as "the only possible remedy"); *United States v. Brown*, 498 F.3d 523, 530 (6th Cir. 2007).

    i) <u>Delay</u>: The delay in petitioner's case was found to be approximately twenty (20) months, whereas a delay of one year or more is presumptively prejudicial, depending on the nature of the charges. *Doggett*, 505 U.S. at 652 n.1. As the state court held (implicitly), this factor weighs in favor of petitioner, and requires application of the remaining *Barker* factors. *See Maples v. Stegall*, 427 F.3d 1020, 1034 6th Cir. 2005) (finding 25-month delay "uncommonly long"), *but see United States v Jackson*, 473 F.3d 660, 668 (6th Cir. 2007) ("[N]either a ten-nor a twenty-month delay is extraordinary under our precedents . . . .").

16

ii) <u>Reason for Delay</u>: The delay was occasioned by the prolonged period of time it took for the prosecution to obtain the DNA results—a delay which trial counsel characterized, during his testimony at the post-conviction hearing, as beneficial to the defense, as he believed the results would be exculpatory and favorable to petitioner. While the results proved to be inconclusive, this factor weighs against petitioner. *Jackson*, 473 F.3d at 666 ("A valid reason for a delay, such as an unavailable witness, weighs in favor of the government.").

iii) <u>Assertion of the Right</u>: Petitioner, so counsel testified at the post-conviction hearing, "expressed an opinion that he wanted a fast and speedy trial," *Bates*, 2008 WL 465271, at *9, but counsel, convinced that a speedy trial motion would fail, so advised his client. Also, counsel was reluctant to pursue a speedy trial based on his belief that the DNA results would be favorable to the defense.

The "opinion" expressed by petitioner does not appear to be an outright assertion of his right to a speedy trial and, given counsel's response, petitioner likely would have understood that he needed to initiate a further contact with counsel on this subject, if petitioner truly wanted a speedy trial, and instruct counsel to make such a motion,. Nothing appears in the record to show that, following this verbal exchange, petitioner re-introduced this topic during his consultation with his lawyer or pressed counsel to take any further action with respect to a speedy trial motion.

iv) <u>Actual Prejudice</u>: As to petitioner's position that, as a result of the delay, possibly he lost witnesses or that, had the motion been made, the state might have forfeited the presentation of its expert witnesses, the Court of Criminal Appeals adopted the trial court's finding that there was no evidence that any witnesses died or otherwise became unavailable because the trial did not occur sooner. This factual finding, which has support in the record, is presumed correct. *Ledbetter v. Edwards*, 35 F.3d 1062, 1071 (6th Cir. 1994). The factual finding likely disposes of this factor against petitioner, since the "possibility of prejudice is not sufficient to support" his claim that his speedy trial right was trammeled. *United States v. Loud Hawk*, 474 U.S. 302, 315 (1986). But even if it does not resolve the factor against petitioner, it is telling that the jury acquitted him of the

aggravated rape charges. As did the state court, this Court concludes that petitioner had not shown any actual prejudice stemming from the delay or any impairment of his defense.

On balance, these factors weigh against petitioner. Since the state court reasonably determined, based on *Barker*, that petitioner's right to a speedy trial had not been violated, it likewise reasonably applied *Strickland* in deciding that counsel's judgment not to seek a speedy trial was a reasonable, strategic decision and that petitioner had failed to establish that he received ineffective assistance. Consequently, this claim does not warrant federal habeas corpus relief.

### 5) *Street Clothes for Witnesses*

Trial counsel's last alleged error occurred when he failed to provide street attire for three defense witnesses who were incarcerated at the time. Petitioner asserts that Tonya Hammonds, Rachel Cross, and Johnny McBee were forced to wear jail uniforms in front of the jury, while the victim, who likewise was imprisoned at the time, and a jail guard were in street clothes and were allowed to sit in the audience. This was extremely prejudicial to petitioner, he contends, because it made his witnesses appear less credible to the jury. Petitioner argues that the prejudice could have been averted had counsel simply provided these witnesses with street clothing.

The state post-conviction court found that petitioner "never claimed that he had any discussion with [trial counsel] about this issue although the same witness-inmates testified at the Rule 412 hearing." *Bates*, 2008 WL 465271, at *9. The state appellate court adopted this finding and, reiterating that petitioner had been acquitted of the aggravated rape charges, itself concluded that he had not shown that the witnesses' jail attire was due to a deficiency of performance nor that any prejudice ensured by the witnesses' appearance.

Compelling a defendant to appear at his jury trial in identifiable prison issue clothing violates his due process right to a presumption of innocence. *Estelle v. Williams*, 425 U.S. 501, 512-13 (1976). This is so because "the constant reminder of the accused's condition implicit in such distinctive, identifiable attire may affect a juror's judgment." *Id.*, at 504-05.

If, however, he has not lodged an objection to such attire, the compulsion element is eliminated and no constitutional violation occurs. *Id*., at 512-13.

In this case, the individuals who wore jail garments were not defendants, were not on trial, and could not have served as a "constant reminder of the *accused*'s condition," so as to affect the jury's verdict as to *petitioner*'s guilt or innocence. Moreover, even if *petitioner* himself had been forced to wear jail clothing to trial, no due process violation would have occurred unless he objected to being tried in that attire and made his objections known. *Ibid*. Petitioner did not object to the jail garb worn by his imprisoned witnesses.

But even if petitioner had made such an objection, he has not identified a Supreme Court precedent, and the Court knows of none, which establishes a constitutional standard governing the physical appearance of a defense witness or one that places an obligation on an attorney for a criminal accused to furnish civilian clothing to his prisoner witnesses. Because it is "not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by th[e Supreme] Court," *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009) (internal quotation marks omitted), no relief is warranted on this claim. Furthermore, applying a new rule, such as this rule would be, would run afoul of the decision in *Teague v. Lane*, 489 U.S. 288 (1989), which holds that, generally, new constitutional rules of criminal procedure do not apply to cases which have become final before the new rules are announced. *Id*., at 310.

      6) *Post-Conviction Counsel's Error*

In his last claim, petitioner alleges that his attorney during his state post-conviction proceedings failed to bring expert or material witnesses to the evidentiary hearing to prove that trial counsel was ineffective. This claim has never been raised before, and likely has been procedurally defaulted, *see Murray v. Carrier*, 477 U.S. 478 (1986), but, at any rate, it provides no basis for habeas corpus relief. *See Pennsylvania v. Finley*, 481 U.S. 551 (1987) (no constitutional right to an attorney in state post-conviction proceedings); *see also* 28 U.S.C. § 2254(i) ("The ineffectiveness or incompetence of

counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254.").

## IV. Conclusion

For the above reasons, this *pro se* state prisoner's application for a writ of habeas corpus will be **DENIED** and this case will be **DISMISSED**.

## V. Certificate of Appealability

One final matter remains for discussion: whether to issue a certificate of appealability (COA) should petitioner file a notice of appeal. See 28 U.S.C. § 2253(c)(1). Petitioner qualifies for issuance of a COA if he has made a substantial showing of the denial of a constitutional right; he makes such a showing by demonstrating that reasonable jurists might question the correctness of the Court's procedural rulings or its assessment of his constitutional claims. *See Slack v. McDaniel,* 529 U.S. 473 (2000). The Court has found that one of petitioner's claims is not cognizable and that the three claims which were adjudicated in state court would not support habeas corpus relief because, after an examination of the state court decisions, the record, and the relevant governing law in Supreme Court cases, those decisions did not run contrary to well established federal law, did not reflect that the state courts had unreasonably applied that law, and did not demonstrate that the state courts had disposed of those claims by unreasonably determining the facts offered to those courts.

The Court now finds that reasonable jurists could not disagree with the resolution of these claims and could not conclude that they "are adequate to deserve encouragement proceed further," *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003), and will **DENY** issuance of a COA. 28 U.S.C. § 2253; Fed. R. App. P. 22(b).

A separate order will enter.

**ENTER**:

s/J. RONNIE GREER
UNITED STATES DISTRICT JUDGE